**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | Hon. _____ |
| **v.** | Case No. 1:17-cv-06416 |
| **MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, LOUIS CARABINI, and MICHAEL CARABINI,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE**
**RELIEF AND PENALTIES UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), an independent agency of the United States Government, by its attorneys, alleges as follows:

**SUMMARY**

1.      From July 16, 2011 through the present (the "relevant period"), Monex Deposit Company and its affiliates Monex Credit Company and Newport Service Corporation (referred to collectively as "Monex"), acting individually and collectively, through various officers, employees and agents, have defrauded thousands of retail customers throughout the United States out of hundreds of millions of dollars while executing tens of thousands of illegal, off-exchange retail commodity transactions.

2.      Monex offers off-exchange, leveraged precious metals trading to retail investors through its "Atlas" program.  Monex deceptively pitches its Atlas program as a safe, secure and profitable way for retail customers to invest in precious metals.  It is not.  To the contrary,

approximately 12,000 leveraged Atlas accounts collectively realized more than $290 million in losses between July 16, 2011 and March 31, 2017—an average of more than $4 million a month. Approximately 90% of leveraged Atlas accounts lost money during this period.  Despite touting the benefits of the Atlas program, Monex never discloses to prospective customers the massive and pervasive losses suffered by its customers.

3.      In an effort to induce customers to trade in its Atlas program, Monex systematically over-represents the likelihood of profit for leveraged Atlas trading, underrepresents the risk of loss, and falsely portrays the relationship between Monex and its Atlas customers as one of "trust."  Among other false or material misleading claims, Monex describes the Atlas program as a way to shield wealth from inflation, but fails to disclose the significant number of customers who have had trading positions force-liquidated at a loss; Monex sales representatives portray themselves as fiduciaries who look out for the best interests of their customers, when, in fact, they are not fiduciaries and do not always act in the customers' best interests; and Monex claims that because metals "will always have value . . . [a customer] can't lose [his or her] investment," when, in fact, the customers can—and often do—suffer substantial losses.

4.      Although it touts the benefits and safety of its Atlas program, Monex has structured the Atlas program in such a way that customer losses are all but inevitable, and Monex stands to gain as a result of these losses.  These Monex gains flowed in part from the Atlas program's structure, which included outsized price spreads, commissions, interest on loans, and administrative fees.  To take just one example, Monex price spreads for a single trade can be 100 times larger than price spreads for a similar trade on a regulated exchange.  Monex serves as the

counterparty for each Atlas transaction, thus benefitting directly from these large price spreads, at the customers' expense.

5.      Monex and its sales representatives engage in high-pressure sales tactics designed to push customers into leveraged precious metals trading in the Atlas program.  As part of their pitch, they misrepresent the likelihood of profit, systematically downplay the risks of leveraged Atlas trading, and falsely promise that Monex will serve as customers' fiduciaries. These sales representatives are paid with commissions and bonuses tied directly to the number of Atlas accounts they open and the volume of transactions in these accounts, rather than customer account performance or rate of return, making clear that Monex prioritizes account opening and trading volume, not account performance.

6.      In addition to operating its Atlas program as a fraud on its customers, Monex also operates the program in violation of governing laws designed to regulate leveraged retail commodity trading.  Leveraged trading on platforms like Monex's bears key similarities to trading on regulated futures exchanges.  Prior to 2010, however, some such platforms eluded regulation by utilizing contract terms that purported to distinguish their trading from that conducted on futures exchanges—in form, but not in substance.  In recognition of the risks that unregulated trading platforms like the Atlas program pose to consumers, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. 111-203, H.R. 4173, commonly referred to as "the Dodd-Frank Act," made it illegal to offer or enter into leveraged commodity transactions with retail customers, unless the transactions are conducted on a regulated derivatives exchange, among other requirements.  Although Monex, through its Atlas program, offers and enters into leveraged commodity transactions with retail customers, it does not conduct those transactions on a regulated exchange.  In addition, the Act requires entities to

3

register with the Commission in order to solicit and accept orders for retail commodity transactions, like those in the Atlas program, and to accept funds in connection with those transactions.  Although Monex, through its Atlas program, solicits and accepts orders for retail commodity transactions, and accepts funds, or extends credit, in connection with those transactions, Monex did not register as required.

7.     By virtue of this conduct and the conduct further described herein, Monex has engaged, is engaging, or is about to engage in conduct in violation of Sections 4(a), 4b(a)(2)(A) and (C), 4d, and 6(c)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6(a), 6b(a)(2)(A), (C), 6d, 9(1) (2012), and Section 180.1(a) of the regulations promulgated under the CEA ("Regulations"), 17 C.F.R. § 180.1(a) (2017).

8.     Louis Carabini and Michael Carabini are liable for Monex's violations of the CEA and the Regulations as "control persons" of Monex because they individually and collectively held and exercised direct or indirect control over Monex and either failed to act in good faith or knowingly induced the acts constituting Monex's violations.

9.     Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint, or in similar acts and practices.

10.     The CFTC accordingly brings this action pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful practices and to compel their compliance with the CEA and Regulations.  In addition, the CFTC seeks restitution, rescission, disgorgement, civil monetary penalties, and such other equitable relief as this Court may deem appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345, which provides that district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the CEA or any rule, regulation, or order thereunder.

12.     Venue properly lies with the Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2012), because Defendants transact business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

## THE PARTIES

13.     The CFTC is an independent federal regulatory agency that administers and enforces the CEA, 7 U.S. C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. pt. 1-190 (2017).

14.     Monex Deposit Company and Monex Credit Company are California limited partnerships organized in 1987.  Newport Service Corporation is a California corporation formed in 1987.  All three entities are located in the same building at 4910 Birch Street, Newport Beach, California.  These three Monex entities are commonly owned and/or controlled by Michael Carabini and his father Louis Carabini through various corporate entities and trusts.  Michael Carabini resides in San Juan Capistrano, California.  Louis Carabini resides in Laguna Beach, California.  None of the defendants has been registered with the Commission in any capacity since 1991.

15.     According to Monex's internal documents, "Monex Deposit Company" buys and sells precious metals with customers through a telephonic sales force who solicit retail customers to enter into Atlas transactions and also accepts funds in connection with its solicitation and

acceptance of orders for Atlas transactions.  Monex Deposit Company acts as a counterparty to Atlas transactions.  According to Monex, "Monex Credit Company" provides loans to customers in these transactions and also leases precious metals to customers.  Monex Credit Company issues monthly account statements to customers and also accepts funds in connection with its extension of credit to secure Atlas transactions.  Monex Credit Company also acts as the counterparty to some Atlas transactions.  According to Monex, "Newport Service Corporation" performs administrative and accounting services for these and other Monex affiliates.  Newport Service Corporation also solicits and accepts orders for Atlas transactions, advertises the Atlas program on television, and offers Atlas trading through other marketing devices.  Newport Service Corporation also accepts funds in connection with its solicitation and acceptance of orders for Atlas transactions.  From either the customer's perspective or an operational perspective, these entities operate seamlessly as a common enterprise.

16.     During the relevant period, Michael Carabini was the primary operational overseer of Monex.  Louis Carabini is the founder of Monex.  Despite passing on many operational responsibilities to his son Michael, Louis Carabini remained substantially involved in all of Monex's operations during the relevant period.  Both Michael and Louis Carabini are signatories on Monex's bank accounts, execute contracts on behalf of Monex and its affiliates, and have the authority to hire and fire Monex employees.  Michael Carabini is primarily responsible for Monex's advertisements and marketing, including the content of the Monex website located at www.monex.com.

## STATUTORY BACKGROUND

17.     Effective July 16, 2011, the Dodd-Frank Act broadened the scope of the Act to include financed commodity transactions with retail customers ("retail commodity transactions").  Section 2(c)(2)(D) of the CEA (7 U.S.C. § 2(c)(2)(D) (2012)) applies to "any

agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-eligible contract participant "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." These retail commodity transactions are subject to Sections 4(a) and 4b of the CEA (7 U.S.C. §§ 6(a), and 6b (2012)) "as if" they are a contract of sale of a commodity for future delivery, commonly known as a "futures contract." As a result, these transactions must be executed on an exchange as required by Section 4(a), and are subject to the anti-fraud provisions in Section 4b.

18.    The CEA defines an Eligible Contract Participant ("ECP"), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million, or $5 million if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." Section 1a(18)(xi) of the CEA, 7 U.S.C. § 1a(18)(xi) (2012).

19.    Section 4(a) of the CEA, 7 U.S.C. § 6(a) (2012), in relevant part, makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

20.    Section 4b(a)(2) of the CEA, 7 U.S.C. § 6b(a)(2) (2012), in relevant part, makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for on

behalf of, or with, any other person, other than on or subject to the rules of a designated contract market— (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for or . . . with the other person.

21.     Effective August 15, 2011, Section 753 of the Dodd-Frank Act amended Section 6(c) of the CEA, 7 U.S.C. § 9 (2012), and broadened the CFTC's anti-fraud authority.  Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce (without regard to whether it is leveraged, margined, or financed), or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of Regulation 180.1, 17 C.F.R. § 180.1 (2017).

22.     Effective August 15, 2011, Regulation 180.1, in relevant part, makes it unlawful for any person, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

23.     Section 4d(1) of the CEA, 7 U.S.C. § 6d(1) (2012), provides that "[it] shall be unlawful for any person to be a futures commission merchant unless — such person shall have registered . . . with the Commission as such futures commission merchant."  Section 1a(28)(A)

of the CEA, 7 U.S.C. § 1a(28)(A)(2012), defines a "futures commission merchant" to include any individual, association, partnership, corporation, or trust that, among other things, is engaged in soliciting or accepting orders for any agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the CEA, 7 U.S.C. § 2(c)(2)(D)(i) (2012), or acts as a counterparty to such transaction, and in or in connection with that activity accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

**THE ILLEGAL TRANSACTIONS AND FRAUDULENT SCHEME**

**I.      Monex's Off-Exchange "Atlas" Commodities Trading Platform**

24.     Monex, through various officers, employees and agents, acting as a common enterprise, offers retail customers two types of transactions: (1) the purchase or sale of physical metals such as coins or bars after full payment for actual delivery; and, (2) off exchange trading of silver, gold, platinum and palladium on a leveraged, margined or financed basis in which a retail customer purportedly purchases physical metal and pays only a portion of the purchase price in the Atlas program.

25.     Through its "Atlas" trading account, Monex offers retail customers the ability to open trading positions in gold, silver, platinum and palladium.  Trading does not take place on a regulated exchange or board of trade.  Instead, Monex operates its own unregulated trading platform, allowing customers to place futures-like trades to speculate on price movements in precious metals, with Monex acting as the counterparty to every transaction.

26.     From July 16, 2011 to March 31, 2017 (the review period) Monex executed approximately 140,000 trades for more than 12,000 customer accounts engaging in leveraged precious metals trading through Monex's Atlas program.

27.     Monex does not limit participation in the Atlas program to individuals who have more than a certain amount invested on a discretionary basis, and indeed the vast majority of Atlas customers are not ECPs.

28.     Monex permits customers to trade "on leverage" or "on margin," meaning that Monex will finance a portion of its customers' trading positions.  Monex requires that Atlas customers deposit funds to serve as margin for open trading positions in their Atlas accounts. During the relevant period Monex's initial margin requirement was generally 22-25% of the value of a trading account's open positions.  With an initial margin requirement of 25%, for example, a trader could deposit $25,000 in an Atlas account and open a position valued at $100,000.

29.     As in futures trading, Atlas account traders can place "long" or "short" trades. Traders opening "long" positions speculate that the price of a metal will go up; traders opening "short" positions speculate that the price of a metal will go down.  As is common in futures trading, Monex gives Atlas account traders the option to place "stop" or "limit" orders to manage their trading positions.  Many customer accounts engage in short-term trading.  For example, during the review period approximately 25% of trading positions opened by leveraged Atlas customer accounts were opened and closed within two weeks.

30.     Monex, through its website and salespersons, solicits and accepts trading orders from customers by telephone.  Monex executes Atlas transactions by recording the trades in its database.  Monex confirms the execution of Atlas transactions by sending customers trade confirmations.

31.     Monex monitors the "equity" in each Atlas account – the value of a customer's metal less their "loan balance" at Monex.  An Atlas account's equity fluctuates along with the

movement in metals prices associated with the account's open trading positions, less accrued interest and service fees.  If equity in a customer's trading account declines to Monex's "call" level, Monex can issue a margin call and require its customer to immediately deposit additional funds to raise the equity level above Monex's initial margin requirement.  Monex can change its margin requirements at any time in its sole discretion.

32.     Trading positions are subject to what Monex calls "forced liquidation," meaning that the trading positions can be liquidated without notice to the customer.  If an Atlas customer's account equity drops to 7%, trading positions are automatically force liquidated. Monex also can liquidate a customer's trading position at any time in its sole discretion without further notice to the customer.

33.     During the review period, out of 12,000 leveraged Atlas accounts, more than 3,000 were subject to a margin call, and at least 1,850 had trading positions force-liquidated. Consequently, during that five-year and eight-month time period, approximately 30% of Monex's leveraged Atlas customer accounts either received a margin call, were subject to forced liquidation of trading positions, or both.

34.     Monex controls all aspects of its trading platform, including the price for every trade.  Generally, Monex sets prices by tracking the spot prices of precious metals traded on CME Group's COMEX and NYMEX contract markets, but Monex imposes a substantial spread between its bid (to buy) and ask or offer (to sell) prices in comparison to prices on these regulated exchanges.

35.     During the relevant period, Monex generally imposed a 3% spread between its bid and ask prices for Atlas program trades (the difference between the bid price and the ask price), which Monex applies to the nominal value of the metal being purchased or sold.  This spread

charge is substantial in comparison to futures trades of equivalent size on the regulated COMEX and NYMEX contract markets.  For example, the spread between bid and ask prices for one COMEX silver futures contract (5,000 ounces) with one tick between the bid and ask is $0.005 per troy ounce, equivalent to $25 per 5,000 ounces of silver.  Buying and selling an equivalent amount of silver (5,000 ounces) on Monex's Atlas platform with a spot price of $17 per ounce (the approximate price of silver during the month of June 2017) would incur a spread charge of approximately $2,550, or more than 100 times the spread cost of equivalent COMEX transactions.

36.     The bulk of Monex's revenues come from the price spread it charges on each trade.  According to Monex's internal data, Monex charged approximately $95 million in price spread during the review period.  Monex also makes money by charging commissions, service fees and interest on its loans to customers.  According to Monex's internal data, Monex also collected approximately $14 million in commissions, $6.4 million in service fees, and more than $57 million in interest charges, for total revenue of more than $170 million during the review period.

37.     Customers are not required to make monthly interest or service fee payments on the loans that they take out to finance trading positions.  Instead, these charges typically are deducted from customers' account equity each month.  The effect of Monex's interest and service fee charges is that the equity in a customer account is constantly eroded by additions to the customer's loan balance.

38.     Monex requires its Atlas customers to sign and return an Atlas account agreement.  The terms of the Atlas account agreement give control over the metals traded on the Atlas trading platform to Monex, not the Atlas customers.

39.     Atlas customers with open trading positions do not take physical delivery of the precious metals that underlie their trading positions.  Rather, the metals are stored in depositories subject to contracts between Monex and the depositories which provide Monex with exclusive authority to instruct the depositories as to the disposition of metals.  Monex customers do not enter into contracts with Monex's depositories relating to any metals traded on Monex's Atlas platform, and do not have any contractual rights conferred upon them by the contracts between Monex and the depositories.

40.     Monex's Atlas customers do not possess or control any metals.  The only way for an Atlas customer to get possession of metal from Monex is to make full payment for the metals, request actual delivery of specific physical metals, and have Monex ship the metals to them, to a pick-up location, or to the customer's agent.

41.     When an Atlas customer opens a long position, Monex claims to transfer to the customer ownership of all of the metals underlying his position, including the financed portion of the position.  This "transfer," however, is in reality just a book-entry in Monex's records.  Monex can close out the customer's long position at any time in its sole discretion and at a price of Monex's choosing.  There is also no requirement that Monex provide notice to a customer before liquidating a customer's position.

42.     In the context of a short position, Monex claims to loan the customer metals that the customer immediately sells back to Monex.  As with a long position, the purported transfer of metals is in reality a book-entry in Monex's records that Monex can close out at any time in its sole discretion and at a price of Monex's choosing.

43.     During the review period, approximately 90% of leveraged Atlas account customers realized losses (including losses from trading, interest charges, and other fees).  Total

net realized losses (including interest charges and fees) for all leveraged Atlas customer accounts during the relevant period were at least $290 million.  Including unrealized profit or loss on open trading positions increases the loss amount to more than $325 million for the review period.  A substantial portion of these losses were caused by fees and charges imposed by Monex.

44.    Defendants were actually aware of, or recklessly disregarded, the massive losses suffered by its leveraged Atlas customers.  Monex does not disclose its customers' performance to its customers or prospects.

## II.    Monex's Fraudulent Scheme

45.    Monex fraudulently induces customers into trading precious metals through its Atlas program by falsely pitching the account as a powerful and profitable way to invest, despite knowing that the vast majority of its leveraged Atlas program customers lose money.

46.    Taken as a whole, the overall message conveyed by Monex is that the Atlas program is a good, safe, secure and profitable way to invest in precious metals.  In fact, the Atlas program is designed to enrich Monex and its owners at the expense of thousands of unwitting customers across the country.  Monex and its sales representatives omit or fail to disclose this and other material information that would make its Atlas program solicitations not misleading.

47.    Monex lures customers into trading in the Atlas program by first touting the benefits of investing in precious metals as an asset class.  Monex emphasizes the benefits and importance of having physical precious metals in a portfolio of investments as a hedge against inflation, or that physical metals are intrinsically valuable, "unlike stocks and bonds."

48.    Monex also highlights the profitability of precious metals investments, including in a "Profit Opportunity" section of its website.  Monex claims elsewhere on its website that "precious metals can offer outstanding price appreciation and profit potential," and makes other

14

similar claims such as: "What's more, in recent years, precious metals have also proven to be outstanding short-term trading vehicles, offering traders periods of outstanding profit potential as metals prices fluctuate, sometimes dramatically, on world markets."

49.     After offering customers statements about the security, intrinsic value and profitability of physical precious metals investments, Monex tells customers that the leveraged Atlas program is one way to achieve the security and profitability associated with physical precious metals investing.

50.     For example, Monex claims in its brochure for the Atlas Account which is distributed to prospects and Atlas customers, that:

    a. The Atlas program is a "unique and powerful way to acquire precious metals with the strength of investment leverage combined with the safekeeping security of independent depository storage."

    b. By investing in precious metals through the Atlas program you can "protect yourself from further declines in the value of the U.S. dollar."

    c. The Atlas program is a way to "shield your wealth against the ravaging effects of inflation, deflation and other economic calamities."

    d. "[R]ight now may be an ideal time to invest in precious metals with the power and built-in security of the Atlas Account."

51.     Similarly, Monex's website describes the Atlas Account as "a way to purchase precious metals using up to 4-to-1 investment leverage" and as a "powerful short-term trading vehicle during periods of rapidly changing precious metals prices."

52.     These claims were false or misleading because Monex knew or recklessly disregarded that approximately 90% of its leveraged Atlas customers lost money, in many cases suffering catastrophic losses.  Monex further knew or recklessly disregarded that these customers never acquired any metals from Monex and therefore received neither security nor intrinsic value from their investment.

15

53.     Monex has a vast amount of customer transactional information at its disposal. Monex closely monitors its Atlas customers' trading and the losses suffered by its customers. Among other statistics, Monex monitors the value of open trading positions, available cash, and customer profits or losses.

54.     For example, in a daily "Position Report," Monex captures a detailed snapshot of each Atlas customer account with information including the account's equity, cushion before a margin call, available cash, trading position value, and the profit or loss on trading positions.  In its "Position Report Summary," Monex tracks information for each Atlas customer account including the number of trades executed by the account, profits or losses, the number of long versus short trades, the total market value of trading positions for each account, and available equity for additional trades.  A "Customer Unrealized Loss" report shows Atlas customer account unrealized losses, realized profits or losses and the market value of open trading positions.

55.     Monex keeps a database of Atlas transactional data.  Using that database, Monex circulates reports to management, including defendants Louis and Michael Carabini, summarizing the data.  These reports demonstrate that leveraged Atlas trading is not a "unique and powerful way to acquire precious metals," or a way to "protect" and "shield" wealth, or an "outstanding short-term trading vehicle" with "outstanding profit potential."

56.     In its Atlas Account brochure, Monex also misleadingly tells customers and prospects in written marketing materials that:

     a.  "The depository custodian will maintain the safekeeping of your precious metals
         until you decide to sell them or take personal possession."
     b.  "Your metals are your sole assets."
     c.   "You are the sole owner of your metals and the sole decision maker on when to
         buy and sell them."

16

57.     These claims are false and misleading because Monex can liquidate its Atlas customers' trading positions at any time in Monex's sole discretion, and during the relevant period significant numbers of leveraged Atlas customers experienced margin calls and forced liquidations.

58.     Reports from Monex's database circulated to management, including defendants Louis and Michael Carabini, summarizing the data, show that customer trading positions frequently are liquidated without customer consent.  For example, Monex generates "Forced Liquidations" and "Equity Calls" reports that reflect the number of forced liquidations and margin calls issued during a month.  Monex has an "auto-force sell" feature in its system that automatically liquidates customer trading positions on a pool-wide basis if there is a sudden price move causing equity in trading accounts to drop below the force liquidations level.

59.     Monex sales training materials encourage sales representatives to lure prospects into Atlas trading by emphasizing profit potential and security.  For example, Monex sales representatives were trained during the relevant period to use phrases on sales calls such as:

    a. If gold were to increase in value by $100 per ounce in the next year, and you had a 30% to 40% net gain, you'd feel pretty good, wouldn't you?"
    b. "I'd like to show you some ways that you might earn a very positive return on investments in precious metals today."
    c. "Discover an opportunity to invest with defined risk, while enjoying the possibility of unlimited upside potential."
    d. "Would you like the potential to earn an annualized rate of return of 20% or more on your money?"
    e. "Since you're looking for short term profit, but with defined risk, I think you're going to love the proposal I have for you."

60.     Such claims are false or misleading, because, for example, Monex knew or recklessly disregarded the fact that during the relevant period leveraged Atlas customers who experienced a "30% to 40% net gain" in a year or experienced a "very positive return" were exceedingly rare, and instead most leveraged Atlas customers lost money.

61.     Many of Monex's most egregious misrepresentations to customers are made in unrecorded sales calls, where Monex sales representatives overcome reluctance to invest by systematically downplaying the true risk of loss and maximizing the profit potential of investing through the Atlas program, and misrepresenting the nature of Monex's relationship with its customers.

62.     Monex sales representatives tell prospects and Atlas customers that investing in the Atlas program is low risk, safe, and secure, when in fact investing in precious metals on leverage in the Atlas Program is highly likely to result in the loss of customer funds, including in substantial part through commissions and spreads that Monex itself pockets.

63.     Sales representatives tell prospects and Atlas customers that because they are investing in physical metals, their investments in the Atlas program will always be worth something because while the value of precious metals fluctuates, metals have always maintained intrinsic value.  Sales representatives do not explain that because of leverage in the Atlas program, customers can lose their entire investments, or that the metals that customers supposedly "own" can be force liquidated by Monex without notice.

64.     Monex training materials teach sales representatives to "close" sales with pitches designed to earn the trust of prospective customers, through language emphasizing profit potential and protection against losses.  Training videos used with sales representatives discuss overcoming hesitancy expressed by prospects by explaining that they have a fiduciary relationship to Atlas customers analogous to the relationship between a lawyer and her client, and that everything they do as sales representative will be in the prospect's, or customer's, best interest.  Sales representatives follow their training and make these claims to prospects and Atlas customers.  These claims are false, as Monex does not act as a fiduciary for its customers.

65.     Despite the ready availability of transactional data showing significant losses being suffered by Atlas customers, and in particular losses in accounts with higher leverage ratios, Monex trains and incentivizes its sales representatives to encourage prospects to open Atlas trading accounts, and to encourage frequent leveraged trading in these accounts.

66.     Monex tells its newly hired account representative that a fundamental "key to success" is "to build a large book of clients that trade metals."  Trainees are encouraged to "Raise Money!," "Have a sense of URGENCY," and "Ask for the order on every call."

67.     Monex's compensation structure for sales representatives reinforces the need to open Atlas accounts and encourage leveraged trading in these accounts.  Sales representatives (and Monex) make more money if they get customers to open and place leveraged trades in Atlas accounts.  The higher the volume and dollar amount of trades, the more commissions and bonuses Monex sales representatives make.  The higher the volume and dollar amount of trades, the more spread revenue Monex makes.  The higher the loan and transaction amount, the more interest and service fees Monex can charge.

68.     The result of the foregoing is that numerous customers in this district and elsewhere are defrauded into investing in the Atlas program, where many invariably suffer significant financial losses.  For example:

      A. Customer A is a 61-year-old woman with limited English skills residing in Charlotte, North Carolina.  After her son was killed while serving with the U.S. military in Iraq, she received approximately $400,000 from her son's government-issued life insurance policy.  She called Monex in the spring of 2011, looking for a safe and secure place to hold some of those funds, which represented her life savings.  Customer A's Monex account representative told her that buying

precious metals from Monex was a safe and secure investment.  The

representative promised her that he would provide her with investment advice

about the precious metals market and would watch her account every day.  The

sales representative promised that profits on her investment would cover any fees

that Monex charged.  Customer A sent Monex $173,500 in April and May

2011.  Over a two year period, Customer A's account representative made all

trading decisions and placed numerous leveraged trades in her account, all the

while telling Customer A that he was an expert in the metals market and that he

was handling her money in the safest and best way possible.  Ultimately,

Customer A lost almost all of the money she invested with Monex.

B.  Customer B is a 77-year-old man residing in Texas.  He contacted Monex in

August 2009 seeking a way to protect his and his wife's life savings from a

downturn in the financial markets.  Customer B's Monex account representative

recommended an Atlas account for Customer B and his wife.  The account

representative said that Monex would act as their trader or stockbroker, watching

the market and taking appropriate steps to protect their investment if the market

moved.  The account representative downplayed the risks of investing in the

precious metals market, telling Customer B and his wife that they could not lose

their investment because they were buying "real metal," would always own that

metal, and the metal would "always be worth something" and the account would

therefore "never go to zero."  The account representative never disclosed the true

risks of investing on leverage in an Atlas account.  Customer B invested his and

his wife's entire life savings of approximately $400,000 with Monex.  Over the

20

life of the account, Monex made all trading decisions.  Often the account
representative used high-pressure sales tactics to obtain Customer B's verbal
consent to enter trades.  Customer B did not understand that he was trading on
leverage.  In 2013, Monex told Customer B that "things had gone crazy" in the
metals market.  In April 2013, Customer B received back only $8,900 out of the
initial $400,000 investment.

C.  Customer C is a 45-year-old woman residing between Los Angeles and New York
City.  In early 2011, she called Monex seeking a low-risk investment in precious
metals that would preserve her life savings of approximately $100,000.  Customer
C's Monex account representative convinced her to invest in Monex's Atlas
Program, promising a 10% return by the end of the year, if not 20% or more.  The
Monex representative downplayed the risks of the Atlas Program, telling
Customer C that she could not lose her investment because gold had never gone
down in price dramatically in 30 years, and "because it's gold, it will never be
worth nothing.  Gold will always have value, so you can't lose your investment."
The Monex account representative said that investing in Monex was "As safe as
having [her] money in a savings account."  Customer C told the Monex
representative that she could not afford to take any losses, and the representative
assured her that the Atlas account was safe and secure.  Customer C invested
approximately $74,000, and ultimately lost all but approximately $29,000 of her
investment.

D.  Customer D is a 54-year-old woman residing in Newport Beach, California.  In
August 2013, Customer D sent her entire retirement savings of more than $1

million to Monex, after a sales representative promised her that her investment would be safe, that investing with Monex was low-risk, and that she and Monex were experts and would watch the market for her and manage the investment. The account representative began trading Customer D's funds on leverage, without explaining what she was doing or adequately disclosing the risks of leveraged Atlas account trading.  Customer D did not understand that her account was trading on leverage.  The account representative told her that she needed to verbally consent to the trades that the representative was placing, and to just say yes to the technical, jargon-filled questions the trade confirmation desk posed to her.  In less than a year and a half, Customer D's account lost more than $760,000.

E.  Customer E is a 69-year-old dual citizen of the United States and Italy, residing in Italy.  After inheriting gold coins from her father, Customer E contacted Monex in late 2012.  Customer E sent Monex the coins, then valued at nearly $175,000, communicating that she wanted Monex to hold them.  Customer E's Monex account representative told her that the Atlas account was a fairly safe way to speculate in the metals market, and she could earn up to four times her investment by using her gold to trade.  Customer E said she did not want to speculate with her gold coins and stressed that she could take no risks with the coins, but agreed to separately send Monex a check for $10,000 to give the Atlas account a try (which she never did send).  Contrary to Customer E's wishes and without her realizing what Monex was doing, the account representative used the coins as collateral for a loan that ultimately reached nearly $600,000.  Customer E told Monex that she

could not understand the account statements sent to her, but the account representative assured her that she could trust him and he assured her that her account was being well handled.  When Customer E requested to withdraw $40,000 in May 2015, she learned that account held only approximately $37,700, and that the rest had been lost in speculative leveraged silver trading.

69.     In the end, trading in an Atlas account is not the safe, secure profitable investment that Monex portrays it to be.  Monex misrepresents the true profit potential and risk of loss in leveraged Atlas trading when it knows or should know customers are highly likely to lose money in these transactions.  Customers are lured into a trap that is structured to enrich Monex, and the customers stand little chance of escaping.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE AGAINST ALL DEFENDANTS
### Off-Exchange Transactions in Violation of Section 4(a) of the CEA

70.     Paragraphs 1 through 70 are re-alleged and incorporated herein by reference.

71.     Between July 16, 2011, and the present, Monex Deposit Company, Monex Credit Company, and Newport Service Corporation ("Monex"), both individually and also operating as a common enterprise, and acting through various officer, employees or agents, violated Section 4(a) of the CEA, 7 U.S.C. § 6(a) (2012), by (a) offering to enter into, (b) entering into, (c) executing, and (d) confirming the execution of retail commodity transactions; and (e) by conducting an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in retail commodity transactions.

72.     Defendants Louis Carabini and Michael Carabini violated Section 4(a) of the CEA, 7 U.S.C. § 6(a), by conducting an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in retail commodity transactions.

23

73.     The retail commodity transactions were offered, entered into and executed on a leveraged or margined basis, or were financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

74.     The retail commodity transactions were offered to, entered into and executed with persons who are not eligible contract participants or eligible commercial entities and who are not engaged in a line of business related to precious metals.

75.     The retail commodity transactions were not made or conducted on, or subject to, the rules of any board of trade, exchange, or contract market.

76.     The acts, omissions, and failures of Louis Carabini and Michael Carabini and other officials, agents, or persons acting for Monex described in this Complaint occurred within the scope of their employment, agency, or office with Monex, and are deemed to be the acts, omissions, and failures of Monex by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

77.     Louis Carabini and Michael Carabini controlled Monex and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Monex's violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2012), Louis Carabini and Michael Carabini are liable for Monex's violations as controlling persons.

78.     Each act of offering to enter into, entering into, executing, confirming the execution of, or conducting any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, retail commodity transactions, other than on or subject to the rules of a board of trade that

has been designated or registered by the Commission as a contract market, is alleged as a separate and distinct violation of Section 4(a) of the CEA, 7 U.S.C. § 6(a).

## COUNT TWO
## AGAINST ALL DEFENDANTS
### Fraud in Violation of Section 4b(a)(2)(A) and (C) of the CEA

79.    Paragraphs 1 through 70 are re-alleged and incorporated herein by reference.

80.    Between July 16, 2011 and the present, Monex Deposit Company, Monex Credit Company, and Newport Service Corporation ("Monex"), both individually and also operating as a common enterprise and acting through various officer, employees or agents, has (a) cheated or defrauded retail customers, or (b) has attempted to cheat or defraud retail customers, or (c) has willfully deceived or attempted to deceive retail customers in regard to orders for, or the disposition or execution of, retail commodity transactions.

81.    As more specifically set forth in paragraphs 46 through 70, Monex made material misrepresentations to its customers about the safety, security and profit potential of trading on its Atlas trading platform, and hid or failed to disclose material information necessary to make those representations not misleading in any material respect.

82.    Monex made these representations knowingly or with a reckless disregard to their truth or falsity.  Monex made these omissions knowingly, or with a reckless disregard for the misleading description of the Atlas trading platform resulting from its failures to disclose material information.

83.    Pursuant to Section 2(c)(2)(D)(iii) of the CEA, 7 U.S.C. § 2(c)(2)(D)(iii) (2012), the retail commodity transactions are subject to Section 4b of the CEA, 7 U.S.C. § 6b (2012), as if they are contracts of sale of a commodity for future delivery.

84.     Therefore, as a result of the foregoing conduct, Monex has violated Section 4b(a)(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C) (2012).

85.     The acts, omissions, and failures of Louis Carabini and Michael Carabini, and other officials, agents, or persons acting for Monex described in this Complaint have occurred within the scope of their employment, agency, or office with Monex, and are deemed to be the acts, omissions, and failures of Monex by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

86.     Louis Carabini and Michael Carabini controlled Monex and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Monex's violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2012), Louis Carabini and Michael Carabini are liable for Monex's violations of Section 4b(a)(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C), as controlling persons.

87.     Each act of cheating or defrauding or attempting to cheat or defraud retail customers, willfully making or causing to be made to retail customers false reports or statements, or willfully deceiving or attempting to deceive retail customers in regard to orders for, or the disposition or execution of, retail commodity transactions, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C).

### COUNT THREE
### AGAINST ALL DEFENDANTS
**Fraud in Violation of Section 6(c)(1) of the CEA and Regulation 180.1(a)(1)-(3)**

88.     Paragraphs 1 through 70 are re-alleged and incorporated herein by reference.

89.     Between August 15, 2011 and the present, Monex Deposit Company, Monex Credit Company, and Newport Service Corporation ("Monex"), both individually and also operating as a common enterprise and acting through various officer, employees or agents, has

intentionally or recklessly, in connection with contracts of sale of commodities in interstate commerce,

    A.      used or employed, or attempted to use or employ, a scheme or artifice to defraud;

    B.      made, or attempted to make, in connection with contracts of sale of commodities in interstate commerce, untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and/or

    C.      engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on Monex's customers.

90.     As a result of the foregoing conduct, Monex's fraudulent conduct violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2017).

91.     The acts, omissions, and failures of Louis Carabini and Michael Carabini and other officials, agents, or persons acting for Monex described in this Complaint have occurred within the scope of their employment, agency, or office with Monex, and are deemed to be the acts, omissions, and failures of Monex by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

92.     Louis Carabini and Michael Carabini controlled Monex and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Monex's violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2012), Louis Carabini and Michael Carabini are liable for Monex's violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3), as controlling persons.

93.     Each use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on Monex's customers is alleged as a separate and distinct violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT FOUR
### AGAINST ALL DEFENDANTS
### Violation of Section 4d of the CEA for Failure to Register
### with Respect to Financed Transactions

94.     Paragraphs 1 through 70 are re-alleged and incorporated herein by reference.

95.     The CEA defines a "futures commission merchant" to include any individual, association, partnership, corporation, or trust that, among other things, is engaged in soliciting or accepting orders for any agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the CEA, 7 U.S.C. § 2(c)(2)(D)(i) (2012), or acts as a counterparty to such transaction, and in or in connection with that activity accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom. Section 1a(28)(A) of the CEA, 7 U.S.C. § 1a(28)(A)(2012).

96.     Between July 16, 2011 and the present, Monex Deposit Company, Monex Credit Company, and Newport Service Corporation ("Monex"), both individually and also operating as a common enterprise and acting through various officer, employees or agents, accepted orders for agreements, contracts, or transactions described in Section 2(c)(2)(D)(i) of the CEA, 7 U.S.C. § 2(c)(2)(D)(i), and acted as the counterparty to Atlas transactions, and in connection with that

conduct accepted money and property (or extended credit in lieu thereof) to margin, guarantee or secure the these trades or contracts.

97.     Section 4d(1) of the CEA, 7 U.S.C. § 6d(1) (2012), provides that "[it] shall be unlawful for any person to be a futures commission merchant unless— such person shall have registered . . . with the Commission as such futures commission merchant."

98.     Between July 16, 2011 and the present, Monex failed to register with the Commission as a futures commission merchant and has therefore violated Section 4d of the CEA, 7 U.S.C. § 6d.

99.     The acts, omissions, and failures of Louis Carabini and Michael Carabini and other officials, agents, or persons acting for Monex described in this Complaint have occurred within the scope of their employment, agency, or office with Monex and are deemed to be the acts, omissions, and failures of Monex by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2017).

100.     Louis Carabini and Michael Carabini have controlled Monex and have not acted in good faith or have knowingly induced the acts constituting the violations of Monex described in this Count.  Pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2012), Louis Carabini and Michael Carabini are therefore liable as controlling persons for Monex's violations of Section 4d of the CEA, 7 U.S.C. § 6d.

## **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.      Find Defendants liable for violating Sections 4(a), 4b(a)(2)(A), (C), 4d, and 6(c)(1) of the CEA, 7 U.S.C. §§ 6(a), 6b(a)(2)(A),(C), 6d, 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2017).

B.      Enter an order of permanent injunction enjoining Defendants and all persons insofar as they are acting as Defendants' agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      Engaging in conduct in violation of Sections 4(a), 4b(a)(2)(A), (C), 4d, and 6(c)(1) of the CEA, 7 U.S.C. §§ 6(a), 6b(a)(2)(A), (C), 4d, 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3);

2.      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the CEA, 7 U.S.C. § 1a (2012));

3.      Entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

4.      Having any commodity interests traded on Defendants' behalf;

5.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

6.      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

7.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption

from registration with the Commission, except as provided for in Regulation 4.14(a)(9),

17 C.F.R. § 4.14(a)(9) (2017); and/or

8.     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)

(2017)), agent, or any other officer or employee of any person (as that term is defined in

Section 1a(38) of the CEA, 7 U.S.C. § 1a(38)) registered, exempted from registration, or

required to be registered with the Commission, except as provided for in Regulation

4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017);

C.     Enter an order requiring Defendants to disgorge to any officer appointed or

directed by the Court, or directly to customers, all benefits received, including, but not limited to,

salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly,

from acts or practices which constitute violations of the CEA as described herein, including pre-

judgment and post-judgment interest;

D.     Enter an order requiring Defendants, as well as any of their successors, to make

full restitution, pursuant to such procedure as the Court may order, to every person or entity

whose funds were received or utilized by them in violation of the provisions of the CEA and/or

Regulations, as described herein, plus pre-judgment interest thereon from the date of such

violations, plus post-judgment interest;

E.     Enter an order directing Defendants and any successors thereof to rescind,

pursuant to such procedures as the Court may order, all contracts and agreements, whether

implied or express, entered into between Defendants and any of the customers whose funds were

received by Defendants as a result of the acts and practices which constituted violations of the

CEA as described herein and restore to each customer the full amount of his or her original

investment;

F.      Enter an order directing each Defendant to pay a civil monetary penalty in the

amount of not more than the greater of: (1) triple the monetary gain to Defendants for each

violation of the CEA or Regulations; or (2) $170,472 for each violation of the CEA or

Regulations;

G.      Enter an order requiring Defendants to pay costs and fees as permitted by

28  U.S.C. §§ 1920 and 2412(a)(2) (2012); and

H.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Date:  September 6, 2017                         Respectfully submitted,


                                                */s Carlin R. Metzger*

                                                Carlin R. Metzger (cmetzger@cftc.gov)
                                                Senior Trial Attorney

                                                Michael D. Frisch (mfrisch@cftc.gov)
                                                Trial Attorney

                                                Eric L. Schleef (eschleef@cftc.gov)
                                                Trial Attorney

                                                Joseph A. Konizeski (jkonizeski@cftc.gov)
                                                Chief Trial Attorney

                                                Scott R. Williamson
                                                (swilliamson@cftc.gov)
                                                Deputy Regional Counsel

                                                Rosemary Hollinger (rhollinger@cftc.gov)
                                                Deputy Director

                                                Commodity Futures Trading Commission
                                                525 West Monroe Street, Suite 1100
                                                Chicago, Illinois 60661
                                                (312) 596-0536 (Metzger)
                                                (312) 596-0700 (main office number)
                                                (312) 596-0714 (facsimile)